# Exhibit A

# CHICAGO DMA TACO BELL FRANCHISEE ASSOCIATION

## CLIENT/AGENCY AGREEMENT

This Agreement sets forth the terms, covenants and conditions of the advertising agency services to be provided to <u>Chicago DMA Taco Bell Franchisee Association</u> (hereinafter referred to as "Client") by <u>Creative Alliance Chicago</u> (hereinafter referred to as "Agency"). The Client or Agency may sometimes be referred to as a "Party" or collectively as the "Parties" as the case may be.

1. <u>Services and Exclusivity</u>

The Agency shall be the local Advertising Agency of record for the Client for the purpose of providing the following services.

   a. Planning the development of advertising and marketing services, and providing counsel in connection with the planning of such advertising and marketing services ("Strategic Market Planning")

   b. Developing and coordinating the development of creative concept and message strategies of advertising and marketing services ("Creative Concept Development")

   c. Producing and coordinating the production and execution of the planned and developed advertising and marketing strategies ("Creative Execution")

   d. Media budgeting, negotiating, purchasing of media and schedule maintenance, including by way of example but without limitation, the placement and buying of media, billing and post buy analysis based on the Taco Bell Media Services Requirements for Agency Media Reporting and Requirements for Approved Vendor Status (set forth in Exhibit A attached hereto and incorporated herein by reference) ("Media Planning/ Buying Services")

-1-

EXHIBIT C PAGE 17

e. Planning, developing and conducting market research and analysis as it pertains to the media or marketing end of the Client's operation; any Market Research Services needed beyond these requirements shall be on a project fee basis stated in separate written documents, which shall become part of this agreement as if stated herein ("Market Research Service")

f. Planning, developing and coordinating the development of creative strategies and providing counsel in connection with the public relations services as it pertains to the media or marketing end of operations; Public Relations Services needed beyond these requirements shall be a on a project fee basis stated in separate written documents which shall be part of this agreement as if stated herein ("Public Relations Services")

g. Planning, developing and coordinating the development of creative strategies and producing sales promotion services, and providing counseling in connection with the sales promotion services ("Sales Promotion Services")

h. Administrative -- monitor cash flow and provide recommendations for spending adjustments, as required

(all of which are hereinafter collectively referred to as "Agency Services").

The Agency Services provided by Agency pursuant to this Paragraph 1 shall further include obtaining appropriate creative from Taco Bell's national agency of record. Agency acknowledges that a user fee to be reimbursed by the client may apply with respect to the use of such material.

The Agency shall not commence any chargeable Agency services without first obtaining the prior approval from the Client.

2. Relationship Between the Parties

It is understood that the Agency and the Client are not and shall not be considered joint ventures or partners of each other. The Agency shall act at all times as independent contractor of the Client, with the authority to act as an agent to implement and maintain said Agency Services. Acknowledgment is made of two fundamental principles on which the Client/Agency relationship is based:

EXHIBIT C PAGE 18

a. The Agency shall finance its own service, but not the advertising of the Client; and

b. In purchasing media, incurring Production and Miscellaneous Costs, or contracting with vendors, the Agency acts solely as agent for the Client and assumes no liability whatsoever for the payment of the invoices for such matters in the event the Client does not pay the Agency.

3. Compensation

 a. Year 1 (January 1 - December 31, 2002)-10% Media Commission

 b. Year 2 (January 1 - December 31, 2003)-12% Media Commission - @ $2MM, additional $250 per store

 c. Year 3 and beyond:

  i. 12% Base Media Commission

  ii. Plus 1% commission for every 2 percentage points Client sales increase is above National sales increase (i.e. Client increase 6%, National increase 2% = Total commission 12% + 2% = 14%)

 d. All LSM – 15% Media Commission

4. Media Costs

For costs related to media, including, without limitation, radio, television, newspaper, Magazine and Out of Home advertising ("Media"), the Agency shall prepare an estimate of such costs ("Estimate of Media Costs") which shall be provided to the Client. The Agency shall not incur any Media costs until the Estimate of Media Costs has been approved by the Client in writing.

Upon the approval by the Client of the Estimate of Media Costs, the Agency shall have the authority to place and/or buy any Media. The Agency shall mail to the Client prior to the beginning of each calendar month an invoice setting forth the charges for Media which are scheduled to air or be published during that calendar month. The Client shall pay to the Agency said charges for Media within thirty (30) days after receipt of said invoice from the Agency less credits, if any, already paid by the Client. The agency will make every attempt to reconcile/actualize media costs to the client within 60 days of receipt of media invoices from the vendor.

-3-

EXHIBIT C PAGE 19

The Client shall receive full allowance for the exact amount of any cash discount allowed to the Agency, provided payment has been made by the Client in accordance with the cash discount terms stated on the Agency's invoices. All invoices subject to discount shall be rendered to the Client in time to allow the Client ample opportunity to take advantage of such cash discounts.

Agency shall observe Taco Bell's Media Services Requirements as may be modified by Taco Bell Corp. from time to time during the term of this Agency Agreement, for the placement of media, to include radio, television, newspaper, magazines and Out of Home; and the reporting of broadcast post buys shall be executed in writing within ninety (90) days, depending on availability of Nielsen Metered Books.

5. <u>Media Contracts and Obligations</u>

   a. In the event that Client pays Agency direct for media placed, it is understood and agreed that as between the Client and Agency, after payment has been received by Agency from the Client in respect of a media obligation, Agency will be solely liable for all obligations, contracts and payments for such media and that the Client will have no liability in this regard.

   b. Agency agrees and undertakes that each and every written agreement which it enters into on the Client's behalf with any media or media-buying organization (be it in the form of an order, order letter, media contract or other) will be reduced to a writing to be signed by both parties thereto. Agency shall ensure that the following clause is a condition of each and every media agreement which Agency enters into on the Client's behalf:

   AGENCY – PRINCIPAL RELATIONSHIP

   "Agency" is placing this order for (<u>name of Client</u>), its Principal. Principal shall have the full right to enforce its rights hereunder in its own name. Notwithstanding the foregoing, and once Agency has been paid by its Principal, Agency agrees to pay and you agree to look solely to Agency for payment. This order and all of Agency's rights hereunder may be assigned from time to time to such advertising agency or agencies as Principal may designate. In the event that you should enter into any arrangement in furtherance of this agreement with any third party, you agree and undertake to reduce such arrangement to a writing signed by both parties, which writing shall notify such third party of the foregoing."

EXHIBIT C PAGE 20

c.  Where arrangements, for media are of an oral nature, Agency will make a best efforts attempt to obtain an acknowledgment from the media or media buying organization containing the above language.

d.  Agency further agrees to notify every media or media buying organization of its agreement under this Paragraph 5 to assume sole liability, as between Agency and the Client, for all obligations, contracts and payment for such media. Agency further agrees to notify every media or media buying organization of its agreement under this Paragraph 5 to assume sole liability, as between Agency and the Client, for all obligation

6.  Production and Miscellaneous Costs

Normal agency administrative expenses, such as local mileage, regular postage, local phone service, office supplies, etc. will be considered the agency's cost of doing business and shall not be billable to Client.

For out-of-pocket costs for travel, long distance, fax, courier, overnight delivery, etc. to attend meetings, conventions, conferences, or for any other purpose requested by Client, the Agency shall prepare an estimate of such costs which shall be provided to the Client. The agency will not incur billable out-of-pocket expenses without the prior approval of Client. All out-of-pocket expenses will be billed net to the Client.

For costs related to production including, without limitation, typography, photography, printing, broadcast production materials, long distance, travel, overnight delivery, faxes, etc. and other costs and expenses related to Agency Services ("Production Costs"), the Agency shall prepare an estimate of such costs ("Estimate of Production Costs") which shall be provided to the Client. The Agency shall not incur any Production Costs (Creative Execution) until the Estimate of Production Costs has been approved by the Client in writing.

Research costs will be billed at net.

If, at any time during the performance of Agency Services, the Agency determines that the Estimate of Production Costs may be exceeded by more than ten percent (10%), the Agency shall prepare and submit for the Client's approval a supplemental Estimate of Production Costs. Client must agree in writing, before the Client shall be obligated to pay for such costs which may exceed ten percent (10%) of Production Costs.

EXHIBIT C PAGE 21

## 7. Effective Date/Duration

Unless otherwise terminated pursuant to Paragraph 8, this Agreement shall have a maximum term of one (1) year commencing as of January 1, 2002 and continuing through January 1, 2003. ("First Contract Year"), and may be renewed by the Client upon expiration of the First Contract Year on an annual basis. Client shall notify Agency in writing of its intent to renew this Agreement at least ninety (90) days prior to the end of each Contract Year. Each renewal of this Agreement, as described above, will be pursuant to the same terms and conditions in effect at the time of each renewal, subject however to either party's request to enter into good faith negotiations regarding the terms and conditions of this Agreement.

## 8. Termination

   a. If Agency is in breach of any of the terms and conditions contained in Paragraph 13, Client shall have the right to immediately terminate this Agreement, upon written notice to Agency.

   b. If Agency is in breach of any of the other material terms and conditions of this Agreement, including by way of example, but not limitation, Agency's failure to maintain its approved vendor status in accordance with Taco Bell Media Services Requirements, and Agency fails to cure the breach within thirty (30) days after its receipt of written notice from Client, Client shall have the right to terminate this Agreement forthwith by written notice to Agency.

      i. If such breach is cured by Agency within the thirty (30) day cure period, this Agreement shall remain in full force and both Parties shall continue to be bound by the terms and conditions contained herein.

      ii. Where such breach is of such a nature that it cannot be cured within such thirty (30) day cure period, it shall be deemed that cure is satisfactory so long as Agency shall commence the curing of such breach within the thirty (30) day cure period, and, thereafter, diligently pursues the curing of same.

-6-


EXHIBIT C PAGE 22

c. Notwithstanding any other provision of this Paragraph 8, either Party may terminate this Agreement by giving the other Party written notice not less than ninety (90) days from the date such Party desires to terminate this Agreement. The ninety (90) day period is necessary to protect both Parties in the orderly conduct of their business and for a smooth transition.

d. The rights, duties and responsibilities of the Agency and the Client shall continue in full force and effect during this period of notice, including the completion of plans for and the placing of advertisements the Client has authorized the Agency to place in any media whose closing dates fall within the 90-day notice period.

The Client shall be responsible for and pay to the Agency and approved Agency Services rendered through the date of termination. The Client shall also pay the Agency its monthly fee during the notice period.

e. Upon full payment of all valid invoices by the Client and payment of all indebtedness owed by Client to Agency, the Agency shall promptly deliver to the Client all documents and other materials in the Agency's possession or control paid for by the Client, related to all Agency Services.

f. The Agency shall also return to the Client all written information in the Agency's possession or control provided by the Client on the Client's restaurants, sales, or marketing data and marketing research information, and the Agency agrees to hold such information in confidence in accordance with Paragraph 16.

g. The Client agrees to reimburse the Agency for production costs of any incomplete work previously authorized by the Client. Such incomplete work shall be returned to the Client, and the Client shall have the right to complete and use such material and ideas in its future advertising.

h. All print, time and talent contracts and the supervision of production of radio or television properties shall be assigned by the Agency to the new agency or to the Client if the Client so elects in writing, not later than the last day of this 90-day notice period, so that a smooth transition may take place at the end of the notice period.

EXHIBIT C PAGE 23

i. The Agency agrees to cooperate with the Client and the new agency to effect an efficient transition of responsibilities.

9. <u>Late Charges</u>

If any payment by the Client is not received by the Agency within thirty (30) days after Client's receipt of Agency invoice, the Client shall be assessed a late charge of one and one-half percent (1 1/2%) of such payment. Additionally, if payment is not received within forty (40) days after a cost or fee invoice date, no further placement and/or purchases of either Media or Miscellaneous Costs need be made by the Agency until all past due indebtedness is paid in full. If collection of any payment becomes necessary, the Client shall pay all costs of collection incurred by the Agency, including reasonable attorneys' fees. Furthermore, if the Agency concludes that the Client's credit has become impaired, the Agency has the sole option of revising its method of billing and requirements as to the terms of payment.

10. <u>Proof of Payment</u>

The Client shall be entitled to proof of all payments by the Agency on behalf of the Client. Agency agrees to supply Client evidence of proof of such payments upon reasonable request of Client.

11. <u>Audit</u>

Agency agrees that Client shall have the right, upon five (5) days' written notice, to audit post-buy analyses, Agency financial statements and all other transactions and costs attendant to the Agency Services provided to Client pursuant to this Agreement for a period of three (3) years beyond the term of this Agreement. Client shall bear the cost of such audits, which shall be conducted during normal business hours. Agency agrees to provide copying capability and work space for Client's representatives and/or its designated agent, and agrees to cooperate fully by allowing Client and/or its designated agent access to all pertinent records in all such audits.

12. <u>Work in Progress</u>

The Client, at its sole discretion, may stay or cancel any Agency Service already in progress. The Agency shall be able to collect not only the costs and fees incurred to the date of cancellation, but also any penalty or cancellation fee actually incurred by any Media or other service or costs if such Agency Service is prematurely terminated.

-8-

EXHIBIT C PAGE 24

13. Competing Clients

Agency agrees that it will not enter into contracts to perform similar services to the Services for any other, party or parties engaged primarily in the "quick service restaurant" "Convenience store," or "sit-down Mexican restaurant" business without the prior written approval of the Client, with the exception of existing clients.

14. Ownership

Subject to the rights of all third parties, all ideas, designs, concepts, original compositions, finished advertisements, radio and television commercials and all other work and material prepared by the Agency for the Client, which are acquired by the Client, shall become the exclusive property of the Client, and may be used, free from any claim by the Agency, by the Client thereafter at any time, without obligation to pay the Agency compensation other than that which the Agency is otherwise entitled to receive as specified in Paragraph 3.

All advertising ideas and campaigns, television and radio scripts, copy illustrations, and other materials prepared by the Agency for the Client, which are rejected or disapproved by the Client, shall remain the property of the Agency and the Agency may use said property at its sole discretion for other usage beyond this Agreement.

15. Evidence of Ownership

The Agency agrees to execute, acknowledge and deliver to the Client any assignments or other documents which may be reasonably requested by the Client and which the Agency has a right to do in order to confirm the ownership by the Client or any affiliate of the Client of the work and materials as defined in the foregoing paragraph.

16. Confidentiality

Agency agrees to maintain the confidentiality of confidential knowledge or trade secret of or relating to Client's business, which come to its knowledge in the course of its dealings with Client, and which is not generally known in the industry in which Agency is engaged. For the purposes of this Agreement, such proprietary information, confidential knowledge or trade secrets shall include by way of example, but not limitation, Client's plans, marketing research, and sales. Agency shall take whatever steps and procedures Client may reasonably request to protect Client's property rights and interest, including obtaining nondisclosure agreements from Agency's employees and persons in its control Agency agrees to execute the Confidentiality Agreement with Client attached hereto and made a part

EXHIBIT C PAGE 25

hereof as Exhibit B. Agency agrees that the provisions of the Confidentiality Agreement survive the termination or expiration of this Agreement.

17. Trademark Usage

The Agency shall adhere to the trademark standards and policies of Client which are in effect or which may be prescribed from time to time, and shall ensure that all advertising has been reviewed and approved by the Client.

18. Indemnification

    a. The Agency shall indemnify and hold Client, its officers, directors, employees, agents, affiliates, parent company, subsidiaries, successors and assigns harmless against any and all claims, counterclaims, suits, demands, regulatory proceedings and/or causes of action, damages, setoffs, liens, attachments, debts, expenses, judgments, or other liabilities of whatsoever kind or nature, including attorneys' fees and costs (including settlement costs) and expenses arising from any actual negligent, reckless, or intentional wrongful act or omission of Agency, its officers, directors, employees and agents in Agency's performance of this Agreement, and from any breach of Agency's representations and warranties or its obligations of confidentiality herein, including by way of example, but without limitation

        i. Any breach by the Agency of any of the representations, terms or conditions of this Agreement;

        ii. Any alleged:

            (a) libel, slander, or defamation or product disparagement;

            (b) infringement of copyright or of trademark, title or slogan, or other property rights such as patents, service marks, and the like;

            (c) piracy, plagiarism, unfair competition or idea misappropriation; or

            (d) invasion of privacy.

EXHIBIT C PAGE 26

       iii.    The preparation of presentation of any advertising concepts and ideas presented by Agency under this agreement.

  b.    The Client agrees to indemnify and hold the Agency harmless from and against any and all claims, demands, regulatory proceedings and/or causes of action, and all damages, costs (including settlement costs) or expenses associated therewith (including, but not limited to, reasonable attorneys' fees) directly arising from advertising prepared or made by the Agency, that is based on information or material furnished by the Client.

  c.    Each Party agrees to notify promptly the other in writing of, and to keep the other fully advised with respect to, such claims, and the progress of any legal actions relating thereto in which the other Party is not a participant;

  d.    The indemnifying Party shall have the right to assume the defense of such a claim instituted against the other Party with legal counsel approved by the other Party; and,

  e.    Neither Party shall enter into any compromise or settlement of the claim without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

  f.    The indemnities under this Paragraph 18 shall survive the termination or expiration of this Agreement.

## 19. Insurance

Agency shall, at its own expense, maintain in force throughout the term of this Agreement, an Advertiser's Liability Policy in a minimum amount of Five Million Dollars ($5,000,000) naming the Client as an additional named insured. Upon execution of this Agreement, the Agency shall provide the Client with a certificate from the insurer confirming the existence of the aforesaid coverage and which certificate shall provide that the insurer shall not terminate, cancel or materially modify such insurance coverage without thirty (30) days' prior written notice to the Client.

## 20. Notices

All notices that are required by any of the terms, covenants or conditions of this Agreement shall be deemed given when the notice is prepared, adequately addressed and deposited in the United States mail, postage prepaid, as follows:

EXHIBIT C PAGE 27

| | |
|---|---|
| If to the Client: | Chicago Taco Bell Franchisee Association<br>C/o NJB Enterprises<br>1020 N. Milwaukee #360<br>Deerfield, IL 60015<br>Attn: Neil Borkan |
| with a copy to: | Taco Bell Corp.<br>17901 Von Karman<br>Irvine, CA 92614<br>Attn: Greg Creed |
| If to the Agency: | Creative Alliance Chicago<br>900 N. Michigan Suite 1830<br>Chicago, IL 60611<br>Attn: Jim Signorelli |

### 21. Waiver

Failure to insist upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder at any one time or more times be deemed a waiver or relinquishment of such right or power at any time or times.

### 22. Modification

This Agreement may not be modified, altered or amended in any manner or at any time except by an agreement in writing executed by the Parties hereto.

### 23. No Assignment

This Agreement is not assignable by either Party without the prior written consent of the other Party.

### 24. Attorney's Fees

In any action to construe or enforce the terms and conditions of the Agreement, the prevailing Party (as determined by a court of competent jurisdiction, if necessary) in such action and in any appeals taken therefrom, shall be entitled to recover its reasonable attorneys' fees and costs.

EXHIBIT C PAGE 28

25. Governing Law

This Agreement shall be construed and enforced in accordance with the laws of the state in which Client is incorporated.

26. Entire Agreement

This Agreement hereby constitutes the entire agreement that exists between the Parties and supersedes any prior agreement and understanding, whether written or oral, relating to the subject matter of this Agreement.

27. Severability

Each provision of this Agreement shall be considered severable and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation or effect of those portions of this Agreement which are valid

28. Section Headings

The section headings contained in this Agreement are for convenience only and shall in no manner be construed as part of this Agreement.

29. Counterparts

This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, and together shall constitute one and the same agreement, with one counterpart being delivered to each Party hereto.

30. Authorized Signatures/Effectiveness

The persons signing this Agreement shall have all legal authority and power in their respective capacities to bind the Client and the Agency, and the Agreement shall not be effective until fully executed and delivered to all Parties.

ACCEPTED FOR: Creative Alliance - Chicago

BY: [signature]

TITLE: President

DATE: 1/18/02

-13-

EXHIBIT C PAGE 29

ACCEPTED FOR: Chicago Association

BY: [signature]

TITLE: President

DATE: 10/7/02

-14-