1  Robert O'Brien (SBN 154372)
   obrien.robert@arentfox.com
2  Steven E. Bledsoe (SBN 157811)
   bledsoe.steven@arentfox.com
3  Steven A. Haskins (SBN 238865)
   haskins.steven@arentfox.com
4  **ARENT FOX LLP**
   555 West Fifth Street, 48th Floor
5  Los Angeles, CA  90013-1065
   Telephone:  213.629.7400
6  Facsimile:   213.629.7401

7  Attorneys for Defendant
   TACO BELL CORP.

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                    SOUTHERN DIVISION

12 | TRACIE THOMAS, individually and on behalf of class of similarly situated individuals, | Case No.  SACV09-1097 CJC (ANx)
13 | | *Assigned to The Hon. Cormac J. Carney*
14 | Plaintiff, | **DECLARATION OF SUSAN VITI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
15 | v. |
16 | TACO BELL CORP., a California corporation, |
17 | | [Filed concurrently with (1) Notice of Motion and Motion for Summary Judgment; (2) Statement of Uncontroverted Facts; (3) Declaration of Neil Borkan; (4) Declaration of Steven A. Haskins; (5) Declaration of Sherry Ostrowski; (6) Declaration of Bernadette Jones; and (7) [Proposed] Judgment]
18 | Defendants. |
19 | |
20 | |
21 | | Date:        October 17, 2011
   | | Time:        1:30 p.m.
22 | | Courtroom:   9B
23 | | Complaint Filed:  September 15, 2009
   | | Trial Date:       October 18, 2011
24 | |

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

SACV09-1097 CJC (ANx)                    DECLARATION OF SUSAN VITI

# DECLARATION OF SUSAN VITI

I, Susan Viti, hereby declare as follows:

1. In 2001, I joined Taco Bell Corp. as a Field Marketing Manager for the Midwest region of the United States. At that time, I became Taco Bell Corp.'s representative to interface with the Chicago Area Taco Bell Restaurant Owners' Advertising Association ("Chicago Association"). As Taco Bell Corp.'s representative to the Chicago Association, I was also appointed to the Chicago Association's Board. I held these positions until 2007, when I left Taco Bell Corp. I held these positions in 2005. I have personal knowledge of the facts stated in this declaration, and would testify to them if necessary at trial.

2. In 2005, the Chicago Association was a local association of franchisees in the Chicago area that set aside a portion of their revenues for local marketing purposes. Taco Bell Corp. was a member of the Chicago Association because it owned some restaurants in the Chicago area. I held a seat on the Board of Directors from 2001-2007. The three other Board positions were filled by local franchise owners elected by a vote of the Chicago Association's full membership. My understanding was always that the Chicago Association was a separate and independent entity from Taco Bell Corp.

3. The Board of the Chicago Association met every month to consider proposals, often face-to-face but sometimes in conference calls. When proposals were made, votes were always held. Minutes of the Board meetings were kept. Proposals that were approved by the Board were subject to a majority vote of the Chicago Association's full membership. I am aware of no situation, including this situation, where these protocols were not followed.

4. I am personally aware of several times when I opposed advertising initiatives, but was overruled by the other Board members and ultimately, a full vote of the Chicago Association's membership. In one case, Mr. Neil Borkan proposed endorsing the use of a debit card with which consumers could accumulate

1  loyalty points by purchasing Taco Bell products at participating Chicago-area
2  restaurants.  I voted against this idea, but the rest of the Board and the membership
3  voted to proceed, and the program was adopted.
4     5.   In another case, the Chicago Association wanted to place
5  advertisements on the program of the radio personality Mancow Mueller.  I
6  believed that placing advertisements on Mr. Mueller's program was counter to Taco
7  Bell Corp.'s media guidelines and had the potential to hurt the Taco Bell brand
8  name.  I voted against this idea, but it was adopted over my objection and the
9  Chicago Association did place advertising on that program.
10    6.   I also voted against the dissemination of coupons in local newspapers,
11 but the Chicago Association approved this anyway.
12    7.   My votes were always based on what I believed was best for the
13 Chicago Association.  I was never told how to vote by anyone else at Taco Bell
14 Corp.
15    8.   I am aware that ESW Partners performed advertising work for the
16 Chicago Association during my tenure on the board.  I have no knowledge of any
17 agreements that ESW Partners had with Taco Bell Corp., and do not know if ESW
18 Partners ever did any work for Taco Bell Corp.  I do not remember ever hearing of
19 ipsh!net, Inc. ("Ipsh") except in the context of this litigation, and I do not know
20 what Ipsh does or did.  I am not aware of any agreements Taco Bell Corp. ever had
21 with Ipsh.
22    9.   One of my responsibilities was to make the Chicago Association's
23 Board aware of Taco Bell Corp.'s national advertising plans.  I did not have any
24 role in devising Taco Bell Corp.'s national advertising plans.
25    10.  The Chicago Association often adopted local promotions that would
26 promote the same product as Taco Bell Corp.'s national advertising campaigns.
27 Taco Bell Corp. would release the timing of the products it intended to advertise
28

sometime in advance, after which I would relay those plans to the other members of the Board.

11. I do not remember specifically making a presentation in 2005 regarding Taco Bell Corp.'s promotion of Nachos Bell Grande, but it was my usual practice to make the Board aware of Taco Bell Corp.'s national advertising plans. The Chicago Association was not required to implement local promotions at the same time as Taco Bell Corp.'s national advertising, in this case or any other.

12. My usual experience with the Chicago Association's local promotions was that ESW Partners would make a presentation to the Board, after which the Board would decide whether to proceed. I believe that I attended such a presentation concerning Nachos Bell Grande in 2005. After hearing that presentation, I voted as a member of the Board to proceed with the promotion. I also voted to proceed with the promotion in my position as Taco Bell Corp.'s representative to the Chicago Association. My recollection is that a full vote of the Board and of the membership were both taken, and I do not recall that there were any dissenting votes.

13. Once a promotion was approved, it was executed by the Chicago Association separate from Taco Bell Corp.'s national campaigns.

14. As part of any Chicago Association promotion, there was a review process by which Taco Bell Corp. would review the use of Taco Bell Corp.'s trademarks and intellectual property to protect the Taco Bell brand. I would generally facilitate this process by sending items that needed to be reviewed to the appropriate persons at Taco Bell Corp. In this case, I sent the bags, trayliners, and a copy of the rules and regulations of the sweepstakes to employees of Taco Bell Corp. I do not remember ever sending any information about a text message to anybody at Taco Bell Corp.

15. I do not remember personally reviewing the text message that is at issue in this lawsuit. I do not know who received the text messages.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on March 26, 2011, at Chicago, Illinois.

*Susan Viti*
Susan Viti