# JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| TRACIE THOMAS, individually and on behalf of class of similarly situated individuals,<br><br>    Plaintiff,<br><br>vs.<br><br>TACO BELL CORP., a California corporation,<br><br>    Defendant. | Case No.: SACV 09-01097-CJC(ANx)<br><br>**ORDER GRANTING DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

On September 15, 2009, Plaintiff Tracie Thomas on behalf of herself and those similarly situated filed this action against Taco Bell Corp. ("Taco Bell"), asserting a claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A)(iii). Her lawsuit arises out of a text message marketing campaign conducted by the Chicago Area Taco Bell Local Owners Advertising Association (the "Association"). She alleges that, as a result of this campaign, she and putative class members received unauthorized text

messages in violation of the TCPA. She asserts that Taco Bell is vicariously liable for the sending of the text message. Upon consideration of the parties' papers and arguments, the Court GRANTS Taco Bell's amended motion for summary judgment. Simply stated, Ms. Thomas has not shown that Taco Bell controlled the manner and means by which the text message was created and distributed.

**II. BACKGROUND**

In 2005, the Association was a non-profit corporation, incorporated in Illinois, and formed pursuant to Taco Bell's Marketing Fund Policy. (Borkan Decl., Ex. A; McMorrow Decl. Ex. K ("MFP").) The Marketing Fund Policy was created "to set forth procedures and guidelines for disbursements and expenditures of monies of the Marketing Fund, which is referred to in certain Franchise Agreements between Taco Bell Corp. and its franchisees." (MFP, at 1.) The Marketing Fund is comprised of the contributions of 4.5% of the sales revenue of both Taco Bell-owned and franchisee-owned stores, 3% of which is used for national Taco Bell advertising, and 1.5% is disbursed to local associations for local advertising. (Def.'s Response to Statement of Genuine Disputes, at 15.) This fund is managed and disbursed by the National Advertising Funds Administration ("NAFA"), a division of Taco Bell, pursuant to the terms of the Marketing Fund Policy. (MFP, at 5.) NAFA pays directly the invoices of vendors to the local association, so long as they meet certain requirements. (*Id.*) One requirement is that "[t]he terms (except for the price) and content of the advertising, and of the promotion and marketing programs, must have been approved in advance by Taco Bell Corp." (*Id.*) The section of the policy discussing such approval provides as follows:

> A. <u>Approvals: When Required.</u> Advertising, marketing and promotion efforts of the restaurants of the Local Association have to be approved in advance, in writing by Taco Bell Corp. <u>unless</u> they are part of a current national program of Taco Bell Corp. No invoice submitted by a

> Local Association will be paid by NAFA if it reflects charges for unapproved programs.

(*Id.*, at 7.) Such approval is not limited to ensuring proper use of Taco Bell's intellectual property, but includes approval based on "consistency with Taco Bell Corp.'s objectives and strategies" and "contribution to the name, reputation, and goodwill of Taco Bell Corp." (*Id.*) The policy does not expressly forbid a local association from conducting a campaign without approval. The Association's bylaws provide that individual members may provide additional contributions to their annual dues (paid to the association or NAFA) "to be used for incremental media, promotion or advertising related commitments made by Individual Members to the Association with regard to specific proposals." (McMorrow Decl., Ex. R, at 3.)

The Association's membership was composed of owners of Taco Bell stores in the Chicago area. (Borkan Decl. ¶ 6.) The Association had twelve members, one of whom was Taco Bell, and the others were Taco Bell franchisees who owned stores in the area. (*Id.*) The Association was governed by a set of bylaws. (McMorrow Decl., Ex. R.) Under those bylaws, the Association was headed by a four-member board of directors. Three directors were elected by a majority vote of the Association's membership. (*Id.*) The bylaws provided that [o]ne seat . . . shall be filled by the Franchisor."[1] (*Id.*) In 2005, Susan Viti, Taco Bell's field marketing manager for the Chicago area, served as Taco Bell's appointed director. (*Id.*)

---

[1] Ms. Thomas insists that this language demonstrates that Taco Bell itself served as director, rather than merely having the right to appoint the fourth director. The Court disagrees. The language of the contract "filled by Franchisor" indicates that Taco Bell could fill the position with the individual of its choice. Additionally, although not explicitly set forth, Illinois corporate law requires that directors be natural persons, because the sections of the code discussing directors uses only gendered pronouns such as "his", "he," "she," and "her" when referring to directors, and never the pronoun "it." *See, e.g.*, 805 Ill. Comp. Stat. 5/8.10; 805 Ill. Comp. Stat. 5/8.30. This Court concludes, therefore, that a director of an Illinois corporation must be a natural person.

Prior to the events at issue in this action, the Association retained ESW Partners ("ESW") to act as its advertising agency. (Haskins Decl., Ex. F.) In 2005, ESW and the Association decided to sponsor a local sweepstakes contest as a Nachos BellGrande promotion. (Borkan Decl. ¶¶ 9, 11, 13.) The promotion included sending an outbound text message to 17,000 "Chicagoans" between the ages of 18 and 34 years of age. (Haskins Decl., Ex. HH.) The Association's board of directors voted for the promotion, including the text component. Ms. Viti participated in the vote and voted for the promotion in her position as director. (Viti Decl. ¶ 12.) The majority of the general membership of the Association voted to proceed with the promotion as well. (McMorrow Decl., Ex. C, at 79:13–22; Haskins Decl., Ex. HH.) As part of that vote, Ms. Viti sent an e-mail to Jennifer Kalseim, an ESW employee, stating "Company votes yes." (McMorrow Decl., Ex. S.) Later, Ms. Kalseim sent Ms. Viti an email for her approval, in her capacity as field marketing manager, of certain aspects of the sweepstakes. Ms. Kalseim attached to this email the contest rules, bag and trayliner artwork, and a creative approval form. Ms. Kalseim's email stated:

> Attached are the rules, artwork, and creative approval form for the Chicago NGB sweepstakes. Sweepstakes will be supported via, [sic] bags, trayliners, radio tags and an email blast to local website members. Upon your approval please forward on to Legal and Brand Communications ASAP, as we have a quick turnaround on this. Sweepstakes rules have been through ESW legal.

(*Id.*, Ex. T.) Ms. Viti then forwarded Ms. Kalseim's email and attachments to Bernadette J. Jones, Taco Bell's advertising compliance analyst, and Jennifer Arnoldt. In her message, Ms. Viti states that "[t]he attach [sic] materials have been approved by Field Marketing to support a [sic] in store contest to promote the Chicken and Steak Nacho Bell Grande window. There is a text messaging component to the promotion." (*Id.*) The attachments to these emails include information for consumers to vote and enter using the same text short code used in the outgoing text message campaign, but otherwise contain no reference to text messaging. (*Id.*)

After the Association approved the promotion, ESW contracted with ipsh!net, Inc. ("Ipsh") to assist in preparing and sending the text message. (Haskins Decl., Ex. P.) Ipsh procured a telephone short code and a list of cellular phone numbers. (*Id.*, Ex. C, at 55:8–57:4, 60:4–7.) Ms. Kalseim, by way of email, insisted to Ipsh that the text message sending coincide with the television and radio ads produced by Taco Bell for the national Nachos Bellgrande campaign.[2] (McMorrow Decl., Ex. O.) Thereafter, Ipsh caused the text message to be sent on or about October 11, 2005. ESW submitted invoices for money owed to Ipsh for the acquisition of the vanity text short code TBELL and the text "push to 17,000 people in the Chicago area," to NAFA, which NAFA paid. (McMorrow Decl., Ex. U.) Ms. Thomas alleges that she received a text message mentioning Taco Bell products in October 2005, but has not retained a copy of the message. (Haskins Decl., Ex. AA.)

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper if the evidence before the court "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[2] Ms. Kalseim's email to Ipsh employees Jeff Birkner and Nihal Mehta reads as follows:

> Putting the breaks and or/delaying this promotion is not an option. There are several other variables involved. The text component is just one. We have 150 stores participating in this program. This Friday morning [3 days to the start of the campaign] it is IMPOSSIBLE to contact each store and stop the in-store part of this promotion from happening. As far as media is concerned traffic went out on Wednesday (TV and Radio).

(McMorrow Decl., Ex. O.)

322 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating either that there are no genuine material issues or that the opposing party lacks sufficient evidence to carry its burden of persuasion at trial. *Celotex Corp.*, 477 U.S. at 325; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Once this burden has been met, the party resisting the motion "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### B. The TCPA

Section 227(b)(1)(A)(iii) of the TCPA provides as follows:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
> to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> . . .
>
> to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call . . . .

47 U.S.C. § 227(b)(1)(A)(iii).  The plain language of the TCPA assigns civil liability to the party who "makes" a call.  The statute is, however, silent as to the issue of vicarious liability.  The Supreme Court has held that, when Congress creates a tort action, "it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  Absent a clear expression of Congressional intent to apply another standard, the Court must presume that Congress intended to apply the traditional standards of vicarious liability with which it is presumed to be familiar, including the alter ego and agency doctrines.[3]

Ms. Thomas argues that the TCPA employs a broader standard of liability: that a party can be held liable if a call or text message is made on its "behalf," that is, if a party receives benefit from the text message.  The Court disagrees.  The language Ms. Thomas draws upon in support of her assertion is found in a different section of the TCPA, relating to penalties for multiple calls, Section 227(c)(5), and is insufficiently related to the section at issue in this action, Section 227 (b)(1)(A)(iii), to inform the Court's reading of the section under which Ms. Thomas is suing Taco Bell.  Moreover, Ms. Thomas' reading of the section under which she sues is not persuasive because Congress inserted this phrase into Section 227(c)(5), but left it out of Section 227(b)(1)(A)(iii), each of which creates a different, unrelated claim under the TCPA.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))).  Ms. Thomas has not provided evidence to overcome the presumption that the traditional

---

[3] Other district courts have also found traditional theories of vicarious liability to be implicitly included in tort actions authorized under the TCPA.  *See, e.g., Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F. Supp. 2d 789, 8096 (M.D. La. 2004).

standard of vicarious liability applies. This Court concludes, therefore, that a party can be held liable under Section 227(b)(1)(A)(iii) directly if it personally "makes" a call in the method proscribed by the statute, or vicariously, such as, if it was in an agency relationship with the party that sent the text message.

### C. Application

Direct liability is inapplicable here as the parties do not dispute that the actual sender of the text was Ipsh, a separate provider of text-message based services retained by ESW. Therefore, Ms. Thomas must be seeking to hold Taco Bell vicariously liable for the actions of the Association and its two agents, ESW and Ipsh. To succeed on this vicarious liability theory, Ms. Thomas must demonstrate that these entities acted as an agent of Taco Bell: that Taco Bell controlled or had the right to control them and, more specifically, the manner and means of the text message campaign they conducted.[4] *See United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010). "Agency means more than mere passive permission; it involves request, instruction, or command." *Klee v. United States*, 53 F.2d 58, 61 (9th Cir. 1931). Ms. Thomas, however, has failed to meet her burden in this regard. Specifically, Ms. Thomas did not present any evidence to the Court that Taco Bell directed or supervised the manner and means of the text message campaign conducted by the Association and its two agents, ESW and Ipsh. She presented no evidence to the Court that Taco Bell created or developed the text message. Nor did she present any evidence to the Court that Taco Bell played any role in the decision to distribute the message by way of a blast text. All of this control over the manner and

---

[4] A party can also be vicariously liable if it is an alter ego of a party engaging in wrongdoing. Ms. Thomas' opposition does not appear to assert liability on an alter ego theory, instead focusing on an agency or "control" theory of liability. Even had such an allegation been made, Ms. Thomas has not presented any evidence upon which a reasonable juror could find that the Association was a "mere instrumentality" of Taco Bell and that the corporate veil should be pierced in this case. *See Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995) (citing *Inst. of Veterinary Pathology, Inc. v. Cal. Health Labs., Inc.*, 116 Cal. App. 3d 111, 119 (1981)).

means of the text message campaign was exercised by the Association, ESW, and Ipsh, and Ms. Thomas has not presented any evidence to the Court demonstrating that Taco Bell controlled the actions of these entities with respect to the campaign. Taco Bell, simply put, had nothing to do with it.

Nevertheless, Ms. Thomas makes several arguments for why she believes Taco Bell is vicariously liable for the text message campaign conducted by the Association, ESW, and Ipsh. Ms. Thomas first argues that Taco Bell's Marketing Fund Policy is evidence that Taco Bell has unfettered control over the Association. The policy requires that, in order for the Association to have NAFA funds cover its expenses for a local campaign, Taco Bell must give its approval. This requirement is insufficient evidence of control over the manner and means of the text message. The policy does not bar a local association from engaging in advertising activities without the approval of Taco Bell; it merely requires approval if the local association wants to fund the campaign with NAFA funds. And although Ms. Thomas asserts that the Association could not have proceeded with the campaign in defiance of Taco Bell, Ms. Thomas has presented no evidence demonstrating that the Association could not have mounted the text campaign without NAFA-administered funds. In any event, this "purse strings" theory does not establish that Taco Bell controlled the manner and means of the text message campaign. *See Aleksick v. 7-Eleven, Inc.*, 205 Cal. App. 4th 1176, 1189–91 (2012) (holding that a franchisor's requirement that it provide certain "ministerial functions" such as payroll processing to its franchisees does not establish agency); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978) ("The fact that a parent corporation finances the operations of a subsidiary is not sufficient to support a finding that the subsidiary is a mere agent or instrumentality of the parent.") (citing *Owl Fumigating Corp v. Cal. Cyanide Co.*, 24 F.2d 717, 719 (D. Del. 1928); *Terry Apartments v. Associated-E. Mortg. Cor.*, 373 A.2d 585, 588–89 (Del. Ch. 1977)). At best, this evidence merely demonstrates that Taco Bell approved of and authorized the

release of NAFA-administered funds for the campaign. Mere approval and funds administration cannot be equated with control over the manner and means by which the campaign was designed and executed.

Ms. Thomas' other arguments fare no better. First, Ms. Thomas asserts that Ms. Viti's vote as a director and Taco Bell's vote as a member establish agency. In both cases, however, these votes amounted only to a minority vote, and do not give rise to an inference of control needed for agency. Ms. Thomas has not presented evidence that without these votes, the Association could not have proceeded with the campaign, and thus, again the votes are evidence of approval not agency even if the votes had constituted a majority vote.[5] *See Japan Petroleum Co.*, 456 F. Supp. at 841 ("'A corporation does not become the agent of another corporation merely because a majority of its voting shares is held by the other.'" (quoting Restatement (Second) of Agency § 14M).); *cf. Transamerica Leasing Inv. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) (holding that one entity "does not create an agency relationship merely by owning a majority of a corporation's stock or by appointing its Board of Directors").

Second, Ms. Thomas asserts that Ms. Viti's actions and statements in the email chain between Ms. Kalseim, Ms. Viti, Ms. Jones, and Ms. Arnoldt constitute a third approval by Taco Bell of the text campaign. However, this email chain is insufficient evidence from which a reasonable person could conclude that Taco Bell directed and supervised the creation and sending of the text message. In her email to Ms. Arnoldt and Ms. Jones, Ms. Viti simply stated that "there is a text message aspect to the campaign." (McMorrow Decl., Ex. T.) It strains credulity too far to conclude that the information relayed in this email chain constitutes approval of the form and content of the text

---

[5] Additionally, Ms. Viti's vote as a director cannot be considered a vote of Taco Bell as she as an individual, and not Taco Bell, was the director.

message, let alone direction and supervision of the creation and distribution of the text message as is required to impose vicarious liability.

Third, Ms. Thomas asserts that the email from ESW to Ipsh stating that the text message needed to coincide with Taco Bell's television and radio promotions is evidence that Taco Bell controlled the distribuition of the text message campaign. This email, however, was between the Association's agents, ESW and Ipsh. Taco Bell did not send the email. It did not receive the email. It was not even copied on the email. To argue that this email between ESW and Ipsh demonstrates that Taco Bell controlled the distribution of the text message is simply not credible.

By her own admission, Ms. Thomas asserts that the evidence she presented, in the light most favorable to her, demonstrates knowledge, approval, and administration of funds:

> Plaintiff's evidence, viewed in the light most favorable to her, shows that Taco Bell knew the details of the campaign, including the intended recipients and language of the text message, and subsequently approved it. It also shows that Taco Bell funded the text message marketing campaign through its NAFA division after deciding it met all the criteria set forth in the Marketing Fund Policy.

(Pl.'s Opp. Amend. Mot. Summ. J, at 8.) However, knowledge, approval, and fund administration do not amount to controlling the manner and means of the text message campaign. Ms. Thomas' evidence of knowledge, approval, and fund administration falls short of establishing that Taco Bell directed or supervised the text message campaign, that was carried out by the Association, ESW, and Ipsh. Consequently, she now cannot hold Taco Bell vicariously liable for their actions.

//

## IV. CONCLUSION

For the foregoing reasons, Taco Bell's amended motion for summary judgment is GRANTED.

DATED: June 25, 2012

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE